UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

LOCALS 302 AND 612 OF THE
INTERNATIONAL UNION OF OPERATING
ENGINEERS-EMPLOYERS
CONSTRUCTION INDUSTRY
RETIREMENT TRUST, Derivatively on Behalf
of LEHMAN BROTHERS HOLDINGS INC.,

                        Plaintiff,

        vs.

RICHARD S. FULD, JR., JOSEPH M.
GREGORY, CHRISTOPHER M. O'MEARA,
THOMAS A. RUSSO, JEREMY M. ISAACS,
DAVID GOLDFARB, BRADLEY H. JACK,
JEFFREY VANDERBEEK, JONATHAN E.
BEYMAN, MICHAEL L. AINSLIE, JOHN F.
AKERS, ROGER S. BERLIND, THOMAS H.
CRUIKSHANK, MARSHA JOHNSON
EVANS, SIR CHRISTOPHER GENT,
ROLAND A. HERNANDEZ, HENRY
KAUFMAN, JOHN D. MACOMBER and
DINA MERRILL,

                        Defendants,

        – and –

LEHMAN BROTHERS HOLDINGS INC., a
Delaware corporation,

                        Nominal Defendant.

——————————————————— x

Civil Action No. 07-cv-03950

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS AND
STATE LAW CLAIMS FOR BREACH OF
FIDUCIARY DUTY, WASTE OF
CORPORATE ASSETS AND UNJUST
ENRICHMENT

DEMAND FOR JURY TRIAL

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Lehman Brothers Holdings Inc. ("Lehman" or the "Company") on behalf of the Company against its Board of Directors and certain of its senior executives (collectively, "Defendants").  This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior Lehman insiders to divert hundreds of millions of dollars of corporate assets to themselves via the manipulation of grant dates associated with hundreds of thousands of stock options granted to Lehman insiders.  Each of the Defendants also participated in the concealment of the backdating option scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions in illicitly obtained incentive compensation and proceeds diverted to them since at least 1996.

2.      In the years leading up to and including 2007, defendants also caused Lehman to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by Lehman carried with them an exercise price that was ***not less than*** the fair market value of Lehman stock on the date of grant and issuance.

3.      In fact, Defendants were aware that the practices employed by the Board allowed the stock option grants to be ***backdated*** to dates when the Company's shares were trading at or near the lowest price for that relevant period.  By early 2007, Defendants' backdating scheme had yielded stock option grants to the Company's executive officers worth millions of dollars.  These grants were included in more than $777 million in stock sale proceeds for Defendants.

- 1 -

4.     Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as New York and Delaware law. By authorizing and/or acquiescing in the stock option backdating scheme, Defendants: (i) caused Lehman to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior Lehman executives; and (iii) subjected Lehman to potential liability from regulators, including the SEC and the IRS.

5.     Defendants' gross mismanagement and malfeasance over the past decade has exposed Lehman and its senior executives to criminal and civil liability for issuing false and misleading financial statements. Specifically, Defendants caused or allowed Lehman to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an inflated view of Lehman's earnings and earnings per share.

6.     Defendants' malfeasance and mismanagement during the relevant period has wreaked hundreds of millions of dollars of damages on Lehman. The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds. Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations so as to void all grants made pursuant to the plans. The Company has now been mentioned as one of several companies likely to have manipulated options. Meanwhile, certain of the Defendants, who received under-priced stock options and/or knew material non-public information regarding Lehman's internal control problems, abused their

fiduciary relationship with the Company by selling over $777 million worth of their personally held shares at artificially inflated prices during the relevant period. This action seeks recovery for Lehman against these faithless fiduciaries, as Lehman's Board of Directors, as currently composed, is simply unable or unwilling to do so.

## JURISDICTION AND VENUE

7.       The claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under state law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

8.       This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

9.       This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.       Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Lehman is located in and conducts its business in this District. Further, one or more of the Defendants either resides in or maintains executive offices in this District.

## PARTIES

11.     Plaintiff Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust is a shareholder of Lehman, and holds and has held Lehman stock since August 2001.

12.     Nominal party Lehman is a Delaware corporation with its principal executive offices located at 745 Seventh Avenue, New York, New York.

13.     Defendant Richard S. Fuld, Jr. ("Fuld") has been Chairman of the Board of the Lehman and Lehman Brothers Inc. ("LBI"), a subsidiary of the Company, since April 1994 and Chief Executive Officer ("CEO") of Lehman and LBI since November 1993.  Previously, Fuld served as President and Chief Operating Officer ("COO") of Lehman from 1993 to 1994.  Fuld joined the Company in 1969 serving in various positions including various executive positions since 1984.  Because of Fuld's positions, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Fuld participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Fuld serves as a member of the Executive Committee.  Based on his knowledge of material non-public information regarding the Company, defendant Fuld sold nearly 4.7 million shares of Lehman stock for proceeds of $209.7 million during the relevant period.

14.     Defendant Joseph M. Gregory ("Gregory") has served as President and COO of Lehman since 2004.  Previously, Gregory served in various management positions at Lehman in the Fixed Income Division from 1980 to 1991, as Co-head of Fixed Income Division from 1991 to 1996,

head of Lehman's Global Equities Division from 1996 to 2000, as Chief Administrative Officer ("CAO") from 2000 to 2002 and as Co-COO from 2002 through 2004. Defendant Gregory joined Lehman in 1974. Because of Gregory's positions, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Gregory participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Gregory sold 6.8 million shares of Lehman stock for proceeds of $255.4 million during the relevant period.

15.    Defendant Thomas A. Russo ("Russo") has served as Chief Legal Officer since 1993 and is an Executive Vice President of Lehman, and additionally serves as a member of and counsel to the Executive Committee of Lehman and is Vice Chairman of LBI. Because of Russo's positions, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Russo participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Russo sold 1.38 million shares of Lehman stock for proceeds of $61.9 million during the relevant period.

16.    Defendant Christopher M. O'Meara ("O'Meara") has served as Executive Vice President and Chief Financial Officer ("CFO") of Lehman since 2004. Additionally, O'Meara has served as Lehman's Global Controller since 2002. O'Meara joined Lehman in 1994, serving in various finance and operations management positions until he was promoted as Assistant Controller from July 1995 to April 2001, and as Financial Controller from April 2001 until his promotion to one of his current positions as Global Controller in 2002. Defendant O'Meara, by his financial expertise, was in a unique position to understand the business of Lehman, as well as its finances, markets and present and future business prospects. Because of O'Meara's positions, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, O'Meara participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant O'Meara sold 15,932 shares of Lehman stock for proceeds of nearly $1.2 million during the relevant period.

17.    Defendant David Goldfarb ("Goldfarb") has served as Global Head of Strategic Partnerships, Principal Investing and Risk of Lehman since October 2006. Previously, Goldfarb served as Global Controller of the Company from 1995 to 2000, CFO from 2000 to December 2004, and as CAO of Lehman from 2004, until his promotion to his current position in 2006. Defendant Goldfarb joined the Company in 1993. Defendant Goldfarb, by his financial expertise, was in a unique position to understand the business of Lehman, as well as its finances, markets and present and future business prospects. Because of Goldfarb's positions, he knew the adverse non-public

information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Goldfarb participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Goldfarb sold 998,760 shares of Lehman stock for proceeds of $47.2 million during the relevant period.

18.    Defendant Jeremy M. Isaacs ("Isaacs") has served as CEO of Lehman Europe since December 1999 and CEO of Lehman Asia since April 2000. Isaacs joined Lehman in 1996 as Co-COO of European Equities, promoted within that year to head of Global Equity Derivatives and then in 1997 to head of European Equities, serving in this capacity until March 1999, when he was appointed COO, Europe in December 1999. Because of Isaacs' positions, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Isaacs participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Isaacs sold 605,000 shares of Lehman stock for proceeds of $19.7 million during the relevant period.

19.    Defendant Bradley H. Jack ("Jack") served in the Office of the Chairman of Lehman from May 2004 to June 2005. Previously, Jack served as Co-COO of the Company from May 2002

- 7 -

until his promotion to the Office of the Chairman.  Defendant Jack joined Lehman in 1984, and served in a number of senior management positions.  Because of Jack's positions, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the relevant period, Jack participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Jack sold 3.4 million shares of Lehman stock for proceeds of $99.1 million during the relevant period.

20.    Defendant Jeffrey Vanderbeek ("Vanderbeek") served in Lehman's Office of the Chairman from 2002 until he resigned from the Company in June 2004.  Defendant Vanderbeek joined the Company in 1984, and served in various senior capacities until he was promoted as COO of Fixed Income Government Department and COO of Fixed Income Derivative Department of Lehman in 1993, serving in this capacity until his promotion in 1996 as head of Global Fixed Income Division, serving in this position until his promotion in 2002 as head of Lehman's Capital Markets Division, serving in this capacity until he was named to his final position with the Company.  Because of Vanderbeek's positions, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the relevant period, Vanderbeek participated in the issuance of false and/or misleading statements, including the preparation of the false and/or

misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Vanderbeek sold 2.3 million shares of Lehman stock for proceeds of $65.4 million during the relevant period.

21.    Defendant Jonathan E. Beyman ("Beyman") had been Chief of Operations and Technology and Executive Vice President of Lehman from July 2002 until his resignation from the Company in May 2006. Previously, Beyman was U.S. Head of Operations of Lehman from March 1999 to July 1999, Global Head of Operations from July 1999 to July 2000 and Chief Information Officer from July 2000 to July 2002. Because of Beyman's positions, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Beyman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Beyman sold 316,562 shares of Lehman stock for proceeds of nearly $14.6 during the relevant period.

22.    Michael L. Ainslie ("Ainslie") has served as a director of Lehman since 1996. Because of Ainslie's position, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member of the Audit Committee, defendant Ainslie caused or allowed the dissemination of the improper public statements

- 9 -

described herein. During the relevant period, Ainslie participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

23.    Defendant John F. Akers ("Akers") has served as a director of Lehman since 1996. Because of Akers' position, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member of the Finance and Risk Committee, defendant Akers caused or allowed the dissemination of the improper public statements described herein. As a member of the Compensation and Benefits Committees, defendant Akers controlled the other Defendants' stock option awards. During the relevant period, Akers participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

24.    Defendant Roger S. Berlind ("Berlind") has served as a director of Lehman since March 1985. Because of Berlind's position, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member of the Audit and Finance and Risk Committees, defendant Berlind caused or allowed the dissemination of the improper public statements described herein. During the relevant period, Berlind participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases

and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Berlind sold 108,592 shares of Lehman stock for proceeds of $1.0 million during the relevant period.

25.    Defendant Thomas H. Cruikshank ("Cruikshank") has served as a director of Lehman since 1996. Because of Cruikshank's position, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member (Chair) of the Audit Committee and member of the Nominating and Corporate Governance Committee, defendant Cruikshank caused or allowed the dissemination of the improper public statements described herein. During the relevant period, Cruikshank participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

26.    Defendant Marsha Johnson Evans ("Evans") has served as a director of Lehman since 2004. Because of Evans' position, she knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. As a member of the Compensation and Benefits Committee, defendant Evans controlled the other Defendants' stock option awards. As a member (Chair) of the Nominating and Corporate Governance Committee and member of the Finance and Risk Committee, defendant Evans caused or allowed the dissemination of the improper public statements described herein. During the relevant period, Evans participated in the issuance of

false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

27.     Defendant Sir Christopher Gent ("Gent") has served as a director of Lehman since 2003.  Because of Gent's position, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Audit Committee, defendant Gent caused or allowed the dissemination of the improper public statements described herein.  As a member of the Compensation and Benefits Committee, defendant Gent controlled the other Defendants' stock option awards.  During the relevant period, Gent participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

28.     Defendant Roland A. Hernandez ("Hernandez") has served as a director of Lehman since 2005.  Defendant Hernandez serves as a member of the Finance and Risk Committee.

29.     Defendant Henry Kaufman ("Kaufman') has been a director of Lehman since 1995.  Because of Kaufman's position, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member (Chair) of the Finance and Risk Committee, defendant Kaufman caused or allowed the dissemination of the improper public statements described herein.  During the relevant period, Kaufman participated in the issuance of

- 12 -

false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Kaufman sold 65,000 shares of Lehman stock for proceeds of nearly $2.6 million during the relevant period.

30.     Defendant John D. Macomber ("Macomber") has served as a director of Lehman since 1994.  Because of Macomber's position, he knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Nominating and Corporate Governance Committee, defendant Macomber caused or allowed the dissemination of the improper public statements described herein.  As a member of the Compensation and Benefits Committee, defendant Macomber controlled the other Defendants' stock option awards.  During the relevant period, Macomber participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

31.     Defendant Dina Merrill ("Merrill") served as a director of Lehman from 1988 until her resignation from the Board in May 2006.  Because of Merrill's position, she knew the adverse non-public information about the business of Lehman, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the relevant period, Merrill participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

32.     The defendants identified in ¶¶13 and 22-30 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶13-21 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶13-21, 24 and 29 are referred to herein as the "Insider Selling Defendants."

## DEFENDANTS' DUTIES

33.     Each officer and director of Lehman named herein owed the Company and Lehman shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Lehman's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of Lehman.  Further, the misconduct of Lehman's officers has been ratified by Lehman's Board, which has failed to take any legal action on behalf of the Company against them.

34.     By reason of their positions as officers, directors and fiduciaries of Lehman and because of their ability to control the business and corporate affairs of the Company, the Defendants owed Lehman and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage Lehman in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Lehman and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control over Lehman to divert assets to themselves via improper and/or unlawful practices.  Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

35.     Because of their positions of control and authority as directors or officers of Lehman, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts

complained of herein.  As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' option backdating scheme; and (ii) willingness to cause Lehman to disseminate false Proxy Statements for 1996-2007, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received.  Because of their positions with Lehman, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to Lehman shareholders and the financial markets but failed to do so.

36.    Between 1996 and 2007, Defendants repeated in each Proxy Statement that the stock option grants made during that period carried an exercise price that was not less than the fair market value of Lehman stock on the date granted, as calculated by the public trading price of the stock at the market's close on that date.  However, Defendants concealed that the stock option grants were repeatedly and consciously backdated to ensure that the strike price associated with the option grants was at or near the lowest trading price for that fiscal period.  Due to Defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiff seeks to have the directors' and officers' plans voided and gains from those plans returned to the Company.  In the alternative, plaintiff seeks to have all of the unexercised options granted to Defendants between at least 1996 and 2002 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have Defendants revise the Company's financial statements to reflect the truth concerning these option grants.

37.    To discharge their duties, the directors of Lehman were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the

business and financial affairs of Lehman.  By virtue of such duties, the officers and directors of Lehman were required, among other things, to:

(a)    manage, conduct, supervise and direct the business affairs of Lehman in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of Lehman);

(b)    neither engage in self-dealing nor knowingly permit any officer, director or employee of Lehman to engage in self-dealing;

(c)    neither violate nor knowingly permit any officer, director or employee of Lehman to violate applicable laws, rules and regulations;

(d)    remain informed as to the status of Lehman's operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e)    prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)    establish and maintain systematic and accurate records and reports of the business and affairs of Lehman and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)    maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Lehman's financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)    exercise control and supervision over the public statements to the securities markets and trading in Lehman stock by the officers and employees of Lehman; and

(i)    supervise the preparation and filing of any financial reports or other information required by law from Lehman and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Lehman and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

38.    Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Lehman, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders which Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Defendants who were also officers and/or directors of the Company during the relevant period has been ratified by the Director Defendants who comprised Lehman's entire Board during the relevant period.

39.    Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed

herein *infra*, and by failing to prevent the Defendants from taking such illegal actions.  As a result, Lehman has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    improvidently paid executive compensation;

(b)    increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

(c)    costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(d)    incurring possible IRS penalties for improperly reporting compensation.

40.    These actions have irreparably damaged Lehman's corporate image and goodwill. For at least the foreseeable future, Lehman will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Lehman's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION

41.    In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

42.    During all times relevant hereto, Defendants collectively and  individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert hundreds of millions of dollars to Lehman insiders and directors and causing Lehman to misrepresent its financial results; (ii) maintain Defendants' executive and directorial positions at Lehman and the profits, power and prestige which Defendants

enjoyed as a result of these positions; (iii) deceive the investing public, including shareholders of Lehman, regarding Defendants' compensation practices and Lehman's financial performance.

43.    The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of Lehman common stock so they could dispose of millions of dollars of their own Lehman stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

44.    Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent Lehman's financial results.  Each of the Defendants was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.

45.    Each of the Defendants aided and abetted and rendered substantial  assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

46.    Lehman is primarily engaged in providing financial services.  Lehman provides an array of equity and fixed income sales, trading and research, investment banking services, and investment management and advisory services.  The Company serves the financial needs of corporations, governments and municipalities, institutional clients and high-net-worth individuals

worldwide.  The Company operates in three business segments: Capital Markets, Investment Banking and Investment Management. Capital Markets represents institutional client-flow activities, including prime brokerage, research, mortgage origination and securitization, secondary trading and financing activities in fixed income and equity products.  Investment Banking provides advice to its corporate, institutional and government clients on various financial matters.    Investment Management provides investment advice and services to institutional and high-net-worth clients on a global basis.

47.    Throughout the relevant period, Defendants caused Lehman to grant them millions of stock options permitting them to buy Lehman stock for pennies on the dollar which they could in turn sell as the Company's stock price increased.  A stock option gives the holder the right to buy a stock at a certain price in the future.  Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

48.    However, many of the hundreds of thousands of options granted to Lehman's executives had a hidden, valuable component:  they were misdated, often making them even more significantly valuable.  The misdated stock option grants fell largely into three categories: (i) "look back" grants, in which the date of the grant was picked retroactively (*e.g*., a decision in February to pick a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized – and sometimes changed – at a later date (*e.g.*, a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where there was a failure to complete the option grant process by the date of the grant (*e.g.*, where there is a

decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used).

## STOCK OPTION GRANTS

49.    Certain of Lehman's manipulative stock option grants are described below:

**December Stock Option Grants**

50.    Defendants made stock grants to Lehman's top executives every December. Nonetheless, the dates selected by defendants in the December time-frame each year were at suspiciously low points.  From 1997-2001, defendants dated their December grants at or near the low point of the month.

- Defendants dated many of their 1997 stock option grants as of December 11, 1997 at $12.14 per share – ***nearly the low of the month***.  In December 1997, the stock traded between $11.94 per share and $13.30 per share with an average trading price of $12.57 per share.

- Defendants dated many of their 1998 stock option grants as of December 14, 1998 at $10.22 per share – ***the low of the month***.  In December 1998, the stock traded between $10.22 per share and $12.19 per share with an average trading price of $11.18 per share.

- Defendants dated many of their 1999 stock option grants as of December 1, 1999 at $19.22 per share – ***the low of the month***.  In December 1999, the stock traded between $19.22 per share and $21.25 per share with an average trading price of $20.36 per share.

- Defendants dated many of their 2000 stock option grants as of December 1, 2000 at $25.56 per share – ***the low of the month***.  In December 2000, the stock traded between $25.56 per share and $35.22 per share with an average trading price of $31.33 per share.

- Defendants dated many of their 2001 stock option grants as of December 3, 2001 at $31.70 per share – ***the low of the month***.  In December 2001, the stock traded between $31.70 per share and $34.76 per share with an average trading price of $33.06 per share.

51.    Graphs demonstrating the timing of these grants follow:



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|---|---|---|---|---|---|---|
| 12/11/97 | Callaghan[1] | 400,000 | $12.14 | $4,856,000 | $12.57 | $5,029,840 |
| 12/11/97 | Cecil,[2] | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |
| 12/11/97 | Fuld | 1,400,000 | $12.14 | $16,996,000 | $12.57 | $17,604,440 |
| 12/11/97 | Gregory | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |
| 12/11/97 | Hintz[3] | 400,000 | $12.14 | $4,856,000 | $12.57 | $5,029,840 |
| 12/11/97 | Jack | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |
| 12/11/97 | Lessing[4] | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |
| 12/11/97 | McKeever[5] | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |
| 12/11/97 | Russo | 400,000 | $12.14 | $4,856,000 | $12.57 | $5,029,840 |
| 12/11/97 | Vanderbeek | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |

[1]    Jeremiah M. Callaghan is a former Managing Director of Lehman and served as President of the Securities Processing Group of Shearson Lehman Brothers, a subsidiary of Lehman.

[2]    John L. Cecil is the former Chief Financial and Administrative Officer of Lehman.

- 22 -



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|---|---|---|---|---|---|---|
| 12/14/98 | Cecil | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |
| 12/14/98 | Fuld | 1,400,000 | $10.22 | $14,308,000 | $11.18 | $15,649,620 |
| 12/14/98 | Gregory | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |
| 12/14/98 | Jack | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |
| 12/14/98 | Lessing | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |
| 12/14/98 | McKeever | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |
| 12/14/98 | Vanderbeek | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |

---

[3]    Charles B. Hinz is a former CFO of Lehman.

[4]    Stephen M. Lessing is the former Head of Global Sales and Research of Lehman.

[5]    Michael F. McKeever is the former Head of Private Equity of Lehman.



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|---|---|---|---|---|---|---|
| 12/1/99 | Cecil | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | Fuld | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | Gregory | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | Jack | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | Lessing | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | McKeever | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | Vanderbeek | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|------|-----------|----------------|----------------|----------------|----------------|----------------|
| 12/1/00 | Fuld | 900,000 | $25.56 | $23,004,000 | $31.33 | $28,199,520 |
| 12/1/00 | Goldfarb | 300,000 | $25.56 | $7,668,000 | $31.33 | $9,399,840 |
| 12/1/00 | Gregory | 700,000 | $25.56 | $17,892,000 | $31.33 | $21,932,960 |
| 12/1/00 | Isaacs | 700,000 | $25.56 | $17,892,000 | $31.33 | $21,932,960 |
| 12/1/00 | Jack | 700,000 | $25.56 | $17,892,000 | $31.33 | $21,932,960 |
| 12/1/00 | Lessing | 400,000 | $25.56 | $10,224,000 | $31.33 | $12,533,120 |
| 12/1/00 | Vanderbeek | 700,000 | $25.56 | $17,892,000 | $31.33 | $21,932,960 |



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|---|---|---|---|---|---|---|
| 12/3/01 | Fuld | 800,000 | $31.70 | $25,360,000 | $33.06 | $26,446,960 |
| 12/3/01 | Goldfarb | 150,000 | $31.70 | $4,755,000 | $33.06 | $4,958,805 |
| 12/3/01 | Gregory | 600,000 | $31.70 | $19,020,000 | $33.06 | $19,835,220 |
| 12/3/01 | Isaacs | 1,600,000 | $31.70 | $50,720,000 | $33.06 | $52,893,920 |
| 12/3/01 | Jack | 600,000 | $31.70 | $19,020,000 | $33.06 | $19,835,220 |
| 12/3/01 | Vanderbeek | 600,000 | $31.70 | $19,020,000 | $33.06 | $19,835,220 |

**2000 Option Grants**

52.     Defendants further dated many of Lehman's stock option grants as of February 18, 2000 at $15.80 per share – ***nearly the low of the year***.  In 2000, Lehman's stock traded between $15.53 per share and $40.00 per share with an average trading price of $25.81 per share.

- 26 -



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Annual Average Stock Price | Total Grant Value Based on Average |
|------|-----------|------------------------|----------------|-----------------------------------|----------------------------|-------------------------------------|
| 2/18/2000 | Fuld | 1,600,000 | $15.80 | $25,280,000 | $25.81 | $41,296,000 |
| 2/18/2000 | Gregory | 1,200,000 | $15.80 | $18,960,000 | $25.81 | $30,972,000 |
| 2/18/2000 | Jack | 1,200,000 | $15.80 | $18,960,000 | $25.81 | $30,972,000 |
| 2/18/2000 | Lessing | 1,200,000 | $15.80 | $18,960,000 | $25.81 | $30,972,000 |
| 2/18/2000 | McKeever | 1,200,000 | $15.80 | $18,960,000 | $25.81 | $30,972,000 |
| 2/18/2000 | Vanderbeek | 1,200,000 | $15.80 | $18,960,000 | $25.81 | $30,972,000 |

**2001 Option Grants**

53.     Defendants further dated certain of Lehman's stock option grants as of September 20, 2001 at $23.32 per share – ***the low of the year***.  In 2001, Lehman's stock traded between $23.32 per share and $42.86 per share with an average trading price of $34.73 per share.  Defendant Goldfarb received 150,000 options at this price.  The total value of Goldfarb's options on the purported grant

date was $3.5 million. Nonetheless, if these options had been priced at the average trading price of the year, the total value of the options would have been $5.2 million – a gain to Goldfarb of $1.7 million.



**2002 Option Grants**

54.       Defendants further dated certain of Lehman's stock option grants as of July 23, 2002 at $25.31 per share – ***the low of the year prior to August 29, 2002***.[6] Between January 1, 2002 and

---

[6]       The Sarbanes-Oxley Act shortened the time requirement when all Form 4s were required to be filed with the SEC to no later than two business days following the transaction. A Form 4 is required to be filed by an officer or director of a company to show when a change in their beneficial ownership such as a stock option grant has occurred. The new filing requirement went into effect August 29, 2002, and only applied to transactions that occurred after that date. This new filing

August 29, 2002, Lehman's stock traded between $25.31 per share and $34.53 per share with an average trading price of $30.52 per share.  Defendant Goldfarb received 1,000,000 options at this price.  The total value of Goldfarb's options on the purported grant date was $25.3 million.  Nonetheless, if these options had been priced at the average trading price, the total value of the options would have been $30.5 million – a gain to Goldfarb of $5.2 million.



**Lehman Brothers**
**January 2, 2000 - August 29, 2002**

    55.    Complicating matters and magnifying the harm to Lehman, during the relevant period, Lehman's internal controls and accounting controls with respect to option grants and

_____

requirement reduced the potential for backdating as a long delay between the issuance and the disclosure of a grant had the potential of allowing insiders to watch stock prices and select dates upon which to grant options with advantageous prices.

exercises, and its financial reporting, were grossly inadequate. The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated. They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

56.    Specifically, in many instances the reported dates that Lehman stock options were granted differed from the dates on which the options appear to have been actually granted. The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose.

57.    Through their fiduciary duties of care, good faith and loyalty, Defendants owed to Lehman a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements. This material non-public information included the problems Lehman faced because of its deficient internal controls. Furthermore, Defendants who were members of the Audit Committee during the relevant period had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies. Defendants who were officers of Lehman had ample opportunity to

discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.  Moreover, Defendants who were directors of Lehman had ample opportunity to discuss this material information with fellow directors at any of the scores of Board meetings that occurred during the relevant period as well as at committee meetings of the Board. Despite these duties, Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the misleading statements to be disseminated by Lehman to the investing public and the Company's shareholders during the relevant period.

58.    Specifically, since at least 1996, Defendants have caused Lehman to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| FISCAL YEAR[7] | REPORTED EARNINGS (LOSS) (in millions) | REPORTED DILUTED EARNINGS PER SHARE FROM CONTINUING OPERATIONS |
|---|---|---|
| 1996 | $416.00 | $0.92 |
| 1997 | $647.00 | $1.18 |
| 1998 | $736.00 | $1.30 |
| 1999 | $1,132.00 | $2.04 |
| 2000 | $1,775.00 | $3.19 |
| 2001 | $1,255.00 | $2.32 |
| 2002 | $975.00 | $1.89 |
| 2003 | $1,699.00 | $3.26 |
| 2004 | $2,369.00 | $3.97 |
| 2005 | $3,260.00 | $5.44 |
| 2006 | $4,007.00 | $6.73 |

59.    Moreover, throughout the relevant period certain Defendants exercised many of these stock options contributing to their ability to sell over $777 million worth of Lehman stock they obtained often by cashing in under-priced stock options:

---

[7]    Lehman's fiscal year ends November 30.

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| BERLIND | 6/4/97 – 6/5/97 | 108,592 | $1,031,630 |
| BEYMAN | 3/24/03 – 1/4/06 | 316,562 | $14,559,453 |
| FULD | 5/17/96 – 9/14/06 | 4,671,826 | $209,726,329 |
| GOLDFARB | 7/13/00 – 3/17/06 | 998,760 | $47,243,645 |
| GREGORY | 6/19/98 – 3/21/06 | 6,841,752 | $255,378,716 |
| ISAACS | 5/8/01 – 10/29/02 | 605,000 | $19,727,740 |
| JACK | 6/25/98 – 8/24/04 | 3,429,178 | $99,131,210 |
| KAUFMAN | 11/10/00 – 6/19/06 | 65,000 | $2,579,158 |
| O'MEARA | 4/6/06 | 15,932 | $1,198,366 |
| RUSSO | 5/13/98 – 10/24/06 | 1,380,932 | $61,857,793 |
| VANDERBEEK | 6/19/98 – 11/20/02 | 2,326,878 | $65,454,540 |
| TOTAL | | 20,760,412 | $777,888,580 |

60.     In early 2007, the Company came under scrutiny as numerous other companies admitted to or were investigated for stock option backdating.

61.     In effect, during the relevant period, the Defendants caused Lehman's shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial statements, business and prospects. Specifically, Defendants caused or allowed Lehman to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of Lehman's earnings and earnings per share.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

62.     Plaintiff brings this action derivatively in the right and for the benefit of Lehman to redress injuries suffered and to be suffered by Lehman as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof,

by the Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

63.    Plaintiff will adequately and fairly represent the interests of Lehman and its shareholders in enforcing and prosecuting its rights.

64.    Plaintiff is an owner of Lehman stock and was an owner of Lehman stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

65.    Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the Lehman Board of Directors to institute this action against the officers and members of the Lehman Board of Directors is excused as futile.  A pre-filing demand would be a useless and futile act because:

(a)    The members of Lehman's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(b)    The Lehman Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Lehman's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board

- 33 -

meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting.  Pursuant to their specific duties as Board members, the Director Defendants are charged with the management of the Company and to conduct its business affairs.  Defendants breached the fiduciary duties that they owed to Lehman and its shareholders in that they failed to prevent and correct the improper stock option granting and financial reporting.  Certain directors are also dominated and controlled by other directors and cannot act independently of them.  Thus, the Lehman Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

(c)     The acts complained of constitute violations of the fiduciary duties owed by Lehman's officers and directors and these acts are incapable of ratification.

(d)     The members of Lehman's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(e)     Any suit by the current directors of Lehman to remedy these wrongs would likely further expose the liability of Defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(f)     Lehman has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself

- 34 -

or others who were responsible for that wrongful conduct to attempt to recover for Lehman any part of the damages Lehman suffered and will suffer thereby.

(g)     In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other Defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS penalties. This they will not do.

(h)     Lehman's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Lehman. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by Lehman against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Lehman, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

(i)     In order to bring this action for breaching their fiduciary duties, the members of the Lehman Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

- 35 -

66.    Plaintiff has not made any demand on shareholders of Lehman to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Lehman is a publicly traded company with over 532 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

### THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT ON LEHMAN'S FINANCIAL STATEMENTS

**The Fiscal 1996 Form 10-K405**

67.    On or about February 28, 1997, the Company filed its fiscal 1996 Form 10-K405 with the SEC.  The fiscal 1996 Form 10-K405 was simultaneously distributed to shareholders and the public.  The fiscal 1996 Form 10-K405 included Lehman's 1996 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Lehman's compensation expense was understated and its net earnings were overstated.

**The Fiscal 1997 Form 10-K405**

68.    On or about February 27, 1998, the Company filed its fiscal 1997 Form 10-K405 with the SEC.  The fiscal 1997 Form 10-K405 was simultaneously distributed to shareholders and the public.  The fiscal 1997 Form 10-K405 included Lehman's 1997 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Lehman's compensation expense was understated and its net earnings were overstated.

**The Fiscal 1998 Form 10-K405**

69.      On or about February 26, 1999, the Company filed its fiscal 1998 Form 10-K405 with the SEC.  The fiscal 1998 Form 10-K405 was simultaneously distributed to shareholders and the public.  The fiscal 1998 Form 10-K405 included Lehman's 1998 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Lehman's compensation expense was understated and its net earnings were overstated.

**The Fiscal 1999 Form 10-K**

70.      On or about February 28, 2000, the Company filed its fiscal 1999 Form 10-K with the SEC.  The fiscal 1999 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1999 Form 10-K included Lehman's 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Lehman's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2000 Form 10-K405**

71.      On or about February 28, 2001, the Company filed its fiscal 2000 Form 10- K405 with the SEC.  The fiscal 2000 Form 10- K405 was simultaneously distributed to shareholders and the public.  The fiscal 2000 Form 10- K405 included Lehman's 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Lehman's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2001 Form 10-K405**

72.      On or about February 28, 2002, the Company filed its fiscal 2001 Form K405 with the SEC.  The fiscal 2001 Form 10- K405 was simultaneously distributed to shareholders and the

public.  The fiscal 2001 Form 10- K405 included Lehman's 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Lehman's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2002 Form 10-K**

73.    On or about February 28, 2003, the Company filed its fiscal 2002 Form 10-K with the SEC.  The fiscal 2002 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2002 Form 10-K included Lehman's 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Lehman's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2003 Form 10-K**

74.    On or about February 26, 2004, the Company filed its fiscal 2003 Form 10-K with the SEC.  The fiscal 2003 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2003 Form 10-K included Lehman's 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Lehman's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2004 Form 10-K**

75.    On or about February 14, 2005, the Company filed its fiscal 2004 Form 10-K with the SEC.  The fiscal 2004 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2004 Form 10-K included Lehman's 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the

backdated stock options.  As a result, Lehman's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2005 Form 10-K**

76.    On or about February 13, 2006, the Company filed its fiscal 2005 Form 10-K with the SEC.  The fiscal 2005 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2005 Form 10-K included Lehman's 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Lehman's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2006 Form 10-K**

77.    On or about February 13, 2007, the Company filed its fiscal 2006 Form 10-K with the SEC.  The fiscal 2006 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2006 Form 10-K included Lehman's 2006 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Lehman's compensation expense was understated and its net earnings were overstated.

**DEFENDANTS' SCHEME BEGINS TO UNRAVEL**

78.    The 1996-2007 Proxy Statements concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between at least 1996 and 2007.  In fact, it was not until early 2007 that shareholders had reason to learn that the Proxy Statements which they had relied upon for years were false and misleading.  Defendants have been unjustly enriched at the expense of Lehman, which has received and will receive less money from the Defendants when they exercise their options at prices

substantially lower than they would have if the options had not been backdated. Each dollar diverted to Defendants via the option backdating scheme has come at the expense of the Company.

## THE ADVERSE IMPACT OF DEFENDANTS' MISCONDUCT

79.    Unlike most companies which avoid such option backdating abuse by issuing stock option grants at the same time each year, which eliminates the potential for backdating, Defendants ensured that executives would not have any such restrictions. Given the many times Lehman's grants were the low of the month in which options were granted, the date of their stock option grants was clearly more than merely coincidental.

80.    As a result of the backdating of options, Defendants have been unjustly enriched at the expense of Lehman, which has received and will receive less money from Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

## TOLLING OF THE STATUTE OF LIMITATIONS

81.    The Counts alleged herein are timely. As an initial matter, Defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading Proxy Statements, by falsely reassuring Lehman's public investors that Lehman's option grants were being administered by a committee of independent directors and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

82.    Lehman's public investors had no reason to know of the Defendants' breaches of their fiduciary duties until early 2007, when Lehman came under scrutiny as numerous other companies admitted to or were investigated for stock option backdating.

## COUNT I

### Violations of §14(a) of the Exchange Act Against
### All Defendants

83.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

84.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

85.     The 1996-2007 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing Lehman to engage in an option backdating scheme, a fact which Defendants were aware of and participated in from at least 1996.

86.     In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

87.     The misrepresentations and omissions in the Proxy Statements were material to plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

88.     The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

- 41 -

## COUNT II

### Accounting

89.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90.     At all relevant times, Defendants, as directors and/or officers of Lehman, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

91.     In breach of their fiduciary duties owed to Lehman and its shareholders, the Defendants caused Lehman, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of Lehman.  By this wrongdoing, the Defendants breached their fiduciary duties owed to Lehman and its shareholders.

92.     The Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the Defendants.

93.     As a result of Defendants' misconduct, Lehman has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

94.     Plaintiff demands an accounting be made of all stock option grants made to Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the Defendants, as well as the disposition of any proceeds received by the Defendants via sale or other exercise of backdated stock option grants received by the Defendants.

## COUNT III

**Breach of Fiduciary Duty and/or Aiding and Abetting
Against All Defendants**

95.     Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

96.     Each of the Defendants agreed to and did participate with Fuld and Goldfarb and the

other Defendants and/or aided and abetted one another in a deliberate course of action designed to

divert corporate assets in breach of fiduciary duties the Defendants owed to the Company.

97.     The Defendants have violated fiduciary duties of care, loyalty, candor and

independence owed to Lehman and its public shareholders, have engaged in unlawful self-dealing

and have acted to put their personal interests and/or their colleagues' interests ahead of the interests

of Lehman and its shareholders.

98.     As demonstrated by the allegations above, Defendants failed to exercise the care

required, and breached their duties of loyalty, good faith, candor and independence owed to Lehman

and its public shareholders, and they failed to disclose material information and/or made material

misrepresentations to shareholders regarding Defendants' option backdating scheme.

99.     By reason of the foregoing acts, practices and course of conduct, the Defendants have

failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward

Lehman and its public shareholders.

100.     As a proximate result of Defendants' conduct, in concert with Fuld and Goldfarb,

Lehman has been injured and is entitled to damages.

## COUNT IV

### Abuse of Control Against All Defendants

101.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.    The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, Lehman, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at Lehman.  As a part of this scheme, Defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding Lehman.

103.    Defendants' conduct constituted an abuse of their ability to control and influence Lehman.

104.    By reason of the foregoing, Lehman has been damaged.

## COUNT V

### Gross Mismanagement Against All Defendants

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    Defendants had a duty to Lehman and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Lehman.

107.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Lehman in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence

and candor in the management and administration of Lehman's affairs and in the use and preservation of Lehman's assets.

108.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Lehman to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Lehman, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Lehman.

109.    By reason of the foregoing, Lehman has been damaged.

## COUNT VI

### Constructive Fraud Against All Defendants

110.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.    As corporate fiduciaries, Defendants owed to Lehman and its shareholders a duty of candor and full accurate disclosure regarding the true state of Lehman's business and assets and their conduct with regard thereto.

112.    As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Lehman's shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of Lehman.  Thus they have committed constructive fraud and violated their duty of candor.

113.    By reason of the foregoing, Lehman has been damaged.

## COUNT VII

### Corporate Waste Against All Defendants

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

- 45 -

115. By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision and by giving away millions of dollars to Defendants via the option backdating scheme, Defendants have caused Lehman to waste valuable corporate assets.

116. As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT VIII

### Unjust Enrichment Against All Defendants

117. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

118. As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of Lehman, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

119. All the payments and benefits provided to the Defendants were at the expense of Lehman. The Company received no benefit from these payments. Lehman was damaged by such payments.

120. Certain of the Defendants sold Lehman stock for a profit during the period of deception, misusing confidential non-public corporate information. These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Lehman. A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT IX

### Against the Officer Defendants for Rescission

121. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

122.    As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and Lehman entered into during the relevant period were obtained through Defendants' fraud, deceit and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's stock option plan which was also approved by Lehman shareholders and filed with the SEC.

123.    All contracts which provide for stock option grants between the Officer Defendants and Lehman and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT X

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Lehman common stock on the basis of such information.

126.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Lehman common stock.

127.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Lehman

common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

128.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.    Directing Lehman to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(i)    a proposal requiring that the office of CEO of Lehman and Chairman of the Lehman Board of Directors be permanently held by separate individuals and that the Chairman of the Lehman Board meets rigorous "independent" standards;

(ii)    a proposal to strengthen the Lehman Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)    appropriately test and then strengthen the internal audit and control function;

(iv)    rotate independent auditing firms every five years;

(v)    control and limit insider stock selling and the terms and timing of stock option grants; and

(vi)    reform executive compensation.

D.    Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

E.    Awarding punitive damages;

F.    As to all improperly dated and/or improperly priced options that have been exercised, ordering Defendants to make a payment to the Company in an amount equal to the difference between the prices at which the options were exercised and the exercise prices the options should have carried if they were priced at fair market value on the actual date of grant;

G.    As to all improperly dated and/or improperly priced options that have been granted but not yet exercised or expired, ordering the Company to rescind such options so they carry the exercise prices they should have carried if they were priced at fair market value on the actual date of grant;

H.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

I.    Granting such other and further relief as this Court may deem just and proper.

- 49 -

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May __, 2007

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
DAVID A. ROSENFELD (DR-7564)

_____
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
TRAVIS E. DOWNS III
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\CptDraft\Derivative\Cpt Lehman Bros Holdings Derv.doc

<u>VERIFICATION</u>

I, SAMUEL H. RUDMAN, hereby declare as follows:

1.     I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, counsel for plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.     I make this Verification because plaintiff is absent from the County of Suffolk where I maintain my office.

Executed this ___ day of May, 2007 at Melville, New York.

_____
                SAMUEL H. RUDMAN